1

2

3

4

5

6

7

8

9              IN THE UNITED STATES DISTRICT COURT

10                 FOR THE DISTRICT OF OREGON

11   VERITA GILL,                    )
                                     )
12                 Plaintiff,        )
                                     )     No.  CV-07-812-HU
13        v.                         )
                                     )
14   COMMISSIONER of Social          )
     Security,                       )     FINDINGS & RECOMMENDATION
15                                   )
                   Defendant.        )
16   _____)

17

18   Tim Wilborn
     WILBORN LAW OFFICE, P.C.
     19093 S. Beavercreek Road, PMB #314
19   Oregon City, Oregon 97045

20        Attorney for Plaintiff

21   Karin J. Immergut
     UNITED STATES ATTORNEY
22   District of Oregon
     BRITANNIA I. HOBBS
23   Assistant United States Attorney
     1000 S.W. Third Avenue, Suite 600
24   Portland, Oregon 97204-2902

25   / / /

26   / / /

27   / / /

28   / / /

1 - FINDINGS & RECOMMENDATION

David F. Morado
REGIONAL CHIEF COUNSEL
Leisa A. Wolf
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Social Security Administration
Office of the General Counsel
701 5th Avenue, Suite 2900 M/S 901
Seattle, Washington 98104-7075

HUBEL, Magistrate Judge:

Plaintiff Verita Gill brings this action for judicial review of the Commissioner's final decision to deny supplemental security income (SSI).  This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).  I recommend that the Commissioner's final decision be reversed and remanded for a determination of benefits.

PROCEDURAL BACKGROUND

Plaintiff applied for SSI on December 10, 2001, alleging an onset date of November 1, 2000.  Tr. 179.  Her application was denied initially and on reconsideration.  Tr. 124-25.  On October 30, 2003, plaintiff appeared, with counsel, at a hearing before an Administrative Law Judge (ALJ).  Tr. 882-923.  On December 23, 2003, the ALJ found plaintiff not disabled.  Tr. 741-51.

On June 1, 2005, the Appeals Council remanded the decision for additional evidence concerning plaintiff's physical and mental impairments, to determine whether drug addiction is a contributing factor to disability, and to review treating and examining source medical records.  Tr. 762-64.

On September 21, 2005, the ALJ conducted a second hearing at which plaintiff appeared with counsel.  Tr. 924-59.  On November 16, 2005, the ALJ again found plaintiff not disabled.  Tr. 107-22.  The Appeals Council denied plaintiff's request for review of the second ALJ decision.  Tr. 9-12.

2 - FINDINGS & RECOMMENDATION

FACTUAL BACKGROUND

Plaintiff alleges disability based on a combination of physical and mental impairments, including mental retardation and personality disorder, bipolar disorder, depression, post-traumatic stress disorder (PTSD), anxiety-related disorder, depression, degenerative disk disease, Hepatitis-C, and substance abuse disorder in partial remission. Tr. 587, 615. At the time of the hearing in September 2005, plaintiff was forty-nine years old. See Tr. 179 (noting plaintiff's date of birth as 1956). Plaintiff has a high school education. Tr. 249.

I. Medical Evidence

The earliest medical evidence in the record shows that in February 1994, plaintiff voluntarily admitted herself to Woodland Park Hospital, following two suicide attempts in the previous ten days. Tr. 711. Plaintiff was hospitalized for eleven days, and then discharged on no medications, but with a recommendation to follow up at the Oregon Health Sciences University (OHSU) Psychiatric Clinic, and to become involved with "Project Network"[1] for certain social services. Tr. 712. Plaintiff had improved during the course of her hospital day, with daily individual psychotherapy sessions. Id. She chose not to try a course of anti-depressants because she was pregnant at the time and worried about the effects of the medication on the fetus. Id.

Next, the record contains a ten-page "Multnomah Clinical

---

[1] Other evidence in the record indicates that Project Network is an inpatient alcohol and drug treatment center. E.g., Tr. 353 (referring to Project Network as a residential drug and alcohol treatment facility).

3 - FINDINGS & RECOMMENDATION

1  Assessment" which appears to have been from the fall of 1998. Tr.

2  323-32.   The purpose of this assessment is unclear.   Linda

3  Kolokolo, Licensed Clinical Social Worker, is identified as the

4  evaluator. Tr. 325. Kolokolo indicated that plaintiff stated she

5  had depression while in jail, and that she faced stress from

6  homelessness, separation/divorce, and being arrested.   Tr. 324.

7  Other notes indicate a problem with cocaine dependence, as well as

8  a history of emotional and physical abuse by a spouse, and

9  molestation as a child.  Tr. 325-26.

10      In an "Entry Progress Form," completed by Multnomah County

11  Corrections Health staff on February 11, 1999, it is noted that

12  plaintiff was a client of Project Network at the time and that she

13  was taking trazodone[2].  Tr. 401.

14      In April 1999, Dr. Matt Bazell, M.D., Medical Director at

15  Project Network, reviewed and approved an assessment of plaintiff

16  done by Kolokolo in late January 1999.   Tr. 333-46.   There,

17  Kolokolo noted that plaintiff had symptoms of depression, anxiety,

18  and post-traumatic stress disorder, including a history of suicide

19  attempt in the last year, sleep disturbance, lack of energy, loss

20  of appetite, mood swings, difficulty concentrating, headaches,

21  visual hallucinations, paranoia, and exposure to traumatic event

22  (being a victim of domestic violence).   Tr. 344.   While she

23  exhibited these symptoms, none had persisted long enough, in

24  Kolokolo's opinion, to support them as a conclusive diagnosis. Id.

25  Kolokolo noted that due to plaintiff's recent recovery from

26  substance abuse, plaintiff would benefit from further evaluation in

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

28      [2]  An antidepressant drug.  www.medicinenet.com

4 - FINDINGS & RECOMMENDATION

1  thirty days to see if her symptoms persisted, or perhaps increased
2  or decreased.  Id.

3      On July 9, 1999, psychologist Gary Sacks, Ph.D., examined
4  plaintiff for Disability Determination Services (DDS).  Tr. 347-52.
5  He concluded that she suffered from chronic major depressive
6  disorder, mild to moderate, and polysubstance abuse, six months
7  into remission by plaintiff's report.  Tr. 352.  He stated that she
8  had borderline personality traits and that borderline intellectual
9  functioning needed to be ruled out.  Id.  He commented that
10 plaintiff's intellectual ability was estimated to lie in the
11 borderline to low average ranges based upon her educational and
12 occupational attainments.  Id.  He further stated that her ability
13 to demonstrate her intellect may be suppressed by her depressed
14 mood.  Id.

15     On July 7, 1999, and again on July 15, 1999, psychologist
16 Sandra Jenkins, Ph.D., examined plaintiff while plaintiff was an
17 inpatient at Project Network.  Tr. 353-357.  Dr. Jenkins
18 interviewed and observed plaintiff, and administered several tests,
19 including the Wechsler Adult Intelligence Scale-Revised (WAIS-R),
20 and the Minnesota Multiphasic Personality Inventory (MMPI).  Tr.
21 353.  Dr. Jenkins concluded that plaintiff presented a "complex and
22 contradictory portrait."  Tr. 356.  Dr. Jenkins noted that because
23 of plaintiff's poor self-esteem and poor self-confidence, she
24 "protects herself by refusing to give her best effort to any task
25 where failure is a possibility."  Tr. 356.  Therefore, it was
26 difficult to draw conclusions about her true abilities.  Id.

27     Dr. Jenkins noted that plaintiff's full scale IQ score put her
28 in the borderline range.  Tr. 385.  She concluded that it was

5 - FINDINGS & RECOMMENDATION

likely that plaintiff had some learning disability or cognitive impairment, but current testing could not confirm that. Tr. 386. Dr. Jenkins diagnosed plaintiff with PTSD, dependent personality disorder with anti-social features, and cocaine dependence, in remission. Id.

Dr. Jenkins recommended that plaintiff be scheduled for a complete physical and neuropsychological work-up, including a CT scan to assess possible brain impairments, and testing for learning disabilities. Id. She further recommended neuropsychological testing to distinguish between attention deficit disorder, memory impairment (explicit and implicit memory test), and malingering. Tr. 357.

In July 2000, plaintiff broke her right foot. X-rays showed a fracture at the base of the right fifth metatarsal, and the proximal right fifth metatarsal. Tr. 497, 498. On July 7, 2000, plaintiff was examined by Dr. David Noall, M.D. of the Portland Bone and Joint Center. Tr. 426. He put her in a short leg walking cast, with weight-bearing as tolerated. Id.

Plaintiff was treated by Dr. Noall for this injury through October 19, 2000. Tr. 421. During that time, she used a "fracture walker" and eventually a cane for walking. Id. At her last visit with him for this injury, Dr. Noall found no residual swelling, mild diffuse tenderness around the base of the fifth metatarsal, and moderately severe pain behavior. Id. X-rays showed the fracture was united and no fracture lines were visible. Id. Dr. Noall continued an earlier recommendation that she do sedentary work and minimal walking. Id.

During the time Dr. Noall was treating plaintiff's foot,

6 - FINDINGS & RECOMMENDATION

plaintiff underwent a CT guided liver biopsy as a result of a positive Hepatitis-C test. Tr. 487. The test showed no abnormality of the liver or spleen. Id.

On January 23, 2001, plaintiff went to the emergency room for left ankle pain as a result of a fall. Tr. 452. X-rays of the ankle and foot showed no fractures or dislocations. Tr. 493. She was diagnosed with a sprain, given a splint, and told to follow up with Dr. Noall. Tr. 453.

Plaintiff saw Dr. Noall on February 5, 2001. Tr. 419-20. Plaintiff complained that the ankle was still quite painful. Tr. 419. Dr. Noall found mild soft tissue swelling around the anterior lateral malleolus. Id. He indicated that she should continue using a crutch. He placed her in a short leg walking cast and told her that she could bear weight as tolerated. Id. He limited her to sedentary work with minimal walking, for six to eight weeks. Tr. 420. Dr. Noall's records indicate that after he saw her on February 5, 2001, she failed to make a follow up appointment until April 2001, when she saw him for a recurrent left ankle sprain. Tr. 417.

On April 18, 2001, plaintiff sought emergency treatment for another left ankle sprain. Tr. 445. She reported falling down stairs and twisting it. Id. Plaintiff was diagnosed with a left ankle sprain, was prescribed Vioxx and Vicodin, and given an air cast. Tr. 582.

Plaintiff saw Dr. Noall on April 26, 2001, presumably for follow-up evaluation and treatment. Tr. 417. He noted that there was diffuse lateral malleolar tenderness with left ankle equivocal swelling. Id. He also noted the presence of mild pain behavior.

7 - FINDINGS & RECOMMENDATION

1  Id.  He noted that x-rays taken at Emanuel Hospital on April 19,

2  2001, were normal.  He diagnosed her with a recurrent left lateral

3  ankle sprain.    Id.    He gave her a short leg walking cast,

4  instructed her to use a crutch, and to bear weight as tolerated.

5  Id.  He also prescribed Vicodin, but indicated it would not be

6  refilled.  Id.  Dr. Noall's notes indicate that he gave plaintiff

7  a note indicating she should do sedentary work, minimal walking,

8  with crutches, and that the estimated length of treatment was four

9  to six weeks.  Id.

10      Plaintiff followed-up with Dr. Noall on May 22, 2001.  Tr.

11  414.  He noted that she was improved and physical examination

12  showed trace tenderness.  Tr. 414.  He discontinued the cast, gave

13  her an air splint, and gave her a note indicating she should do

14  sedentary work with minimal walking.  Id.  The estimated time of

15  this treatment was two to four weeks.  Id.

16      On September 7, 2001, a Multnomah County Corrections Health

17  nurse noted that plaintiff was depressed because of her

18  incarceration and her family situation.  Tr. 390.  Her husband had

19  attacked her and cut her with a knife.  Id.  Her children do not

20  get along with him.  Id.  The attack made her marriage worse, but

21  plaintiff wanted to work things out.  Id.  She apparently had been

22  using crack for two to three years, with her last use on August 29,

23  2001.  Tr. 389.  The nurse assessed plaintiff as suffering from

24  depression.  Tr. 388.

25      On September 10, 2001, plaintiff was seen by Scott Haynes,

26  Corrections Health Psychiatric Mental Health Nurse Practitioner.

27  Tr. 386-87.  She reported being clean from drugs for three years,

28  but relapsing on alcohol and crack cocaine shortly before her

8 - FINDINGS & RECOMMENDATION

1  incarceration.  Tr. 386.  Haynes noted that plaintiff had a crying
2  spell, dysphoric mood, and highly limited eye contact.  Id.  He
3  noted that she expressed feeling overwhelmed in three areas:  her
4  children and their return to their father, her husband's drug abuse
5  and subsequent physical abuse, and pending legal action against
6  her.  Id.  He noted that her expressed thoughts demonstrated little
7  insight and/or poor judgment, into the seriousness of her husband's
8  behaviors.    Id.    Haynes  assessed  her  as  suffering  from
9  polysubstance  dependence,  and  adjustment  disorder  with  mixed
10 anxiety and depression.  Tr. 387.  He prescribed doxepin[3] to
11 promote sedation, lift her mood, and decrease her anxiety.  Id.

12     On September 11, 2001, Corrections Health Nurse C. Borgmeier,
13 R.N., completed a health assessment of plaintiff.  Tr. 404-05.
14 Plaintiff noted that she had broken her feet in 2001 and had
15 painful ambulation.  Tr. 405.  She referred to a habit of smoking
16 cocaine, but denied ever sharing needles.  Id.  She stated that in
17 the past, she had been depressed enough to ask for help and had
18 attempted suicide.  Tr. 404.

19     On November 21, 2001, plaintiff was examined by Dr. Noall for
20 a right foot injury.  Tr. 412.  She heard a "pop" and experienced
21 pain.  Id.  On physical exam, Dr. Noall found slight lateral
22 forefoot swelling, and mild tenderness around the distal fourth and
23 fifth metatarsals.  Id.  X-rays revealed no fractures.  Id.  His
24 diagnosis was post-traumatic right foot pain, with no evidence of
25 fracture or dislocation.  Id.  He provided plaintiff with a

26

27

28     [3]  A tricyclic antidepressant medication.
       www.medicinenet.com

9 - FINDINGS & RECOMMENDATION

Stromgren ankle support, told her to bear weight as tolerated, and prescribed Vicodin. <u>Id.</u> He also said she should engage in limited standing and walking, and gave her a note indicating that she should be on the lower bunk of the domestic violence shelter where she was residing. <u>Id.</u>

On January 2, 2002, plaintiff went to the OHSU emergency department complaining of severe neck and back pain after falling on December 21, 2001, while getting on a bus. Tr. 428. On physical exam, plaintiff had tenderness to palpation along the bilateral paraspinal muscles, particularly tenderness along the trapezius extending towards the suprascapular region. <u>Id.</u> She had full range of motion of the neck. <u>Id.</u> Tenderness was also seen along the L4-L5 parapsinal muscles. <u>Id.</u> The emergency department physician concluded that plaintiff had a significant strain and spasm of her paraspinal muscles. Tr. 429. Plaintiff received a prescription for Valium and Vicodin. <u>Id.</u>

Plaintiff then received chiropractic care for her injuries related to this incident, from Zchon R. Jones, D.C., beginning on January 23, 2002, and lasting until April 8, 2002. Tr. 525-41. She received a variety of therapies, including massage, hot packs, trigger point therapy, and chiropractic adjustments. Tr. 534-36. At the end of her treatment, plaintiff reported a "significant resolution of the majority of her original complaints." Tr. 527. Although she noted she still had "up and down" days, she reported that overall, she felt better. <u>Id.</u>

Between January 11, 2002, and February 22, 2002, plaintiff met with social worker J. Workman-Purvine, MSW, at Jean's Place, a women's facility run by Transition Projects, Inc., an agency

10 - FINDINGS & RECOMMENDATION

serving Portland's homeless citizens. Tr. 501-09. Over the course
of the approximately six weeks of counseling sessions, Workman-
Purvine noted that plaintiff presented with numerous symptoms of
depression and anxiety, although it was unclear if her symptoms
were Axis I symptoms or Axis II traits. Id. Workman-Purvine noted
plaintiff's reports of feeling overwhelmed, and of experiencing
panic attacks. Tr. 507, 508.

Workman-Purvine assessed plaintiff as having a history of
polysubstance abuse, and then indicated a rule out bipolar II
disorder mixed episode, and a rule out anxiety disorder, nos. Id.
Workman-Purvine stated that despite plaintiff's denial of manic or
hypomanic episodes, Workman-Purvine observed symptoms that might
indicate a hypomania, including flight of ideas, distractability,
and decreased need for sleep. Id. Workman-Purvine noted that the
subjective reports of depressive symptoms might indicate the
possibility of a "mixed episode." Id.

On February 1, 2002, plaintiff reported feeling more
depressed, noting symptoms that included alternating insomnia and
hypersomnia, fatigue, irritability, poor concentration, feelings of
numbness, and mild suicidal ideation with no current plan or
intent. Tr. 506. She also reported persistent worrying and more
panic attacks. Id.

Workman-Purvine stated that plaintiff continued to present
with significant affect instability. Id. Though plaintiff's
symptoms mimicked a mixed episode, Workman-Purvine could not
establish enough symptoms to warrant a diagnosis for mania or
hypomania. Id. Workman-Purvine indicated that plaintiff's anxiety
symptoms most resembled a panic disorder. Id. The assessment of

11 - FINDINGS & RECOMMENDATION

1  plaintiff at the time was a mood disorder, nos, and rule out panic

2  disorder with agoraphobia.  Id.

3      On February 8, 2002, plaintiff's depressive symptoms were

4  noted as increasing, despite her having started on doxepin and

5  Zoloft[4], which she apparently received from a walk-in mental health

6  clinic.  Tr. 505.  Workman-Purvine was concerned about plaintiff

7  possibly attempting suicide.  Id.  A couple of weeks later, on

8  February 15, 2002, plaintiff reported an improvement in her overall

9  mood and believed that the anti-depressants were beginning to work.

10  Tr. 503.  She reported improved sleep, greater ease in waking up,

11  more energy, and a greater sense of hope.  Id.  Workman-Purvine

12  continued to assess plaintiff as having a mood disorder, nos, and

13  rule out panic disorder with agoraphobia.  Id.  She also added rule

14  out PTSD.  Id.

15      In her final appointment with Workman-Purvine, plaintiff

16  reported three deaths in her family in the previous week, rendering

17  her numb.  Tr. 502.  Workman-Purvine stated that she was concerned

18  plaintiff might once again spiral into a depressive episode.  Id.

19      During the time plaintiff was seeing Workman-Purvine, it

20  appears that she made contact with Network Behavioral HealthCare,

21  Inc., run by Cascadia Behavioral HealthCare.[5]  Tr. 592-93.  Her

22

23      [4]  A selective serotonin reuptake inhibitor (SSRI), used to
    treat depression and panic disorder. www.medicinenet.com
24

25      [5]  Network Behavioral Healthcare's address is 2415 SE 43rd
    Avenue in Portland.  Tr. 598.  Cascadia has the same address.
26  Tr. 699-700.  Additionally, an August 29, 2003 record identifies
    the Cascadia program as:  "Program: Cascadia - NBHC - Network
27  Walk-In Clinic."  Tr. 788; see also 792 (record indicating it is
    an "NBHC Face Sheet" and a "Cascadia Behavioral HealthCare -
28  Clinical Face Sheet").

12 - FINDINGS & RECOMMENDATION

1  first contact was on January 31, 2002, and it is unclear if this
2  was in person or by phone.  Id.  The form reciting the information
3  obtained  from  plaintiff  on  that  date,  is  labeled  "CallNet
4  Appointment Summary," suggesting this was a phone interview.  Id.

5      On February 1, 2002, plaintiff was seen in Network's Urgent
6  Care Clinic and was started on doxepine and Zoloft.  Tr. 520-21,
7  596-97.  Her next visit to Network appears to have been March 18,
8  2002.  At that time, Cynthia Eckersley, Licensed Clinical Social
9  Worker, completed a Treatment Coordination Report for plaintiff,
10 listing her diagnoses as BiPolar II, rule out PTSD, and cocaine
11 dependence in remission.  Tr. 598.  Eckersley noted that plaintiff
12 presented  as  depressed  and  complained  of  having  a  nervous
13 breakdown.  Id.  She reported feeling suicidal.  Id.; see also Tr.
14 511-16, 595 (other notes and assessment by Eckersley).

15     Plaintiff was also examined by Dr. Vern Read, M.D., at that
16 time.  Tr. 601-02.  Dr. Read noted that plaintiff had stopped
17 taking the doxepine and Zoloft the previous week, when she ran out
18 of  the  medications  she  had  received  earlier.   Tr. 601.   She
19 reported to him that she did not feel that the Zoloft had helped at
20 all and while the doxepine had helped her get to sleep, it did not
21 allow her to stay asleep for more than several hours.  Id.

22     Dr. Read noted that plaintiff continued to be quite depressed,
23 labile,  and  anxious.   Id.   She  had  problems  with  insomnia,
24 difficulty  with  concentration,  and  occasionally  heard  her  name
25 called.  Id.  Dr. Read assessed plaintiff as having chronic
26 depression that may not have responded well to SSRIs.  Tr. 602.  He
27 noted  her  family  history  of  bipolar  disorder.   Id.   He  also
28 remarked that she had severe polysubstance dependence problems and

13 - FINDINGS & RECOMMENDATION

likely PTSD.  _Id._  He prescribed Remeron[6].  _Id._  Although Dr. Read instructed plaintiff to return in two weeks, the record does not show a return visit to Network in that timeframe.  A medication management form indicates that she canceled her March 29, 2002 appointment.  Tr. 683.

Jane Starbird, Ph.D., examined plaintiff on April 30, 2002, and provided a psycho-diagnostic report.  Tr. 542-47.  Dr. Starbird based her report on her interview with plaintiff, a mental status exam, the results of the Beck Depression Inventory II, and  review of Workman-Purvine's progress notes from January and February 2002. _Id._  Dr. Starbird diagnosed plaintiff as having major depressive disorder, recurrent and severe, and crack/cocaine dependence in full remission and alcohol dependence in full remission.  Tr. 546.

The medication management sheet from Network indicates that Dr. Read renewed plaintiff's Remeron prescription on May 15, 2002. Tr. 683.

On August 20, 2002, plaintiff and Kolokolo signed a "Diagnosis and Treatment Plan" as part of a Project Network Provisional Mental Health Assessment.   Tr. 617.   The initial part of the report indicates that plaintiff's probation or parole officer recommended that plaintiff complete treatment.  _Id._  She was twenty-four days substance free at the time.  _Id._  Her diagnoses at the time included cocaine dependence, depression nos and PTSD, migraine headaches, with a current stressor being the separation from her children.  _Id._  Kolokolo assessed plaintiff as having a Global Assessment of Functioning (GAF) of 38.  _Id._  The treatment plan

---

[6]  A tricyclic antidepressant.  www.medicinenet.com

14 - FINDINGS & RECOMMENDATION

1   included attending certain groups, submitting to random urinalyis

2   tests, attending alcohol and drug individual therapy, and

3   completing a comprehensive mental health assessment.   Id.

4       A more formal treatment plan is dated September 16, 2002, and

5   notes that Cindy Wang, M.A., and Kolokolo were the clinicians.   Tr.

6   618-21.   Her diagnoses include alcohol dependence, cocaine

7   dependence, chronic PTSD, bipolar disorder, and psychotic disorder

8   nos.   Tr. 618.   Additional diagnoses noted were Hepatitis-C,

9   arthritis, neck pains, migraines, and cavities in teeth.   Id.   A

10  four-page plan of action was outlined, and plaintiff signed that

11  she had participated in the development of the plan with her

12  counselor.   Tr. 621.

13      On September 13, 14, 15, and 20, 2002, plaintiff was evaluated

14  by psychologist George Tinker, Ph.D, at the request of Senior &

15  Disabled Services.   Tr. 603-16.   Dr. Tinker's fourteen-page report,

16  dated October 6, 2002, began by noting that plaintiff presented

17  with "a number of medical conditions, symptoms suggestive of both

18  a thought disorder and emotional disturbance, cognitive deficits,

19  and history of substance dependence."   Tr. 603.   Dr. Tinker

20  administered several different tests over the course of his

21  sessions with plaintiff.   Tr. 610-13.

22      Dr. Tinker's diagnostic impressions were that plaintiff

23  suffered from bipolar disorder, PTSD, and cognitive disorder NOS.

24  Tr. 615.   He noted that she had alcohol dependence with

25  physiological dependence in a controlled environment and cocaine

26  dependence without physiological dependence in a controlled

27  environment.   Id.   He also found that she had mild mental

28  retardation and personality disorder NOS, with schizotypal and

15 - FINDINGS & RECOMMENDATION

borderline traits.  Id.

In his narrative conclusion, Dr. Tinker stated that plaintiff functioned intellectually within the range of mild mental retardation.  Tr. 613.  She had pervasive cognitive deficits, and exhibited concrete thinking, impaired judgment, poor visual and auditory memory with evidence of proactive inhibition, limited vocabulary skills, and impaired visual perception, spatial orientation and nonverbal reasoning, planning, sequencing, and logical reasoning.  Id.  She also suffered from severe anxiety and depression with psychotic features.  Id.  Dr. Tinker expressed a concern that plaintiff was functionally illiterate.  Tr. 614.  He noted her history of repeated suicidal and self-mutilation behavior.  Id.

As for her employability, he stated that she was moderately limited in her ability to remember locations and work-like procedures as she sometimes became disoriented and lost in familiar surroundings.  Id.  Her ability to understand, remember, and to carry out very short, simple, and detailed instructions was markedly limited, as was her ability to maintain attention and concentration for extended periods.  Id.  Her ability to adhere to a schedule was markedly limited, as was her ability to sustain an ordinary routine without special supervision.  Id.  Her ability to work in coordination with others was also markedly limited.  Id.

Dr. Tinker also found plaintiff markedly limited in the following abilities: (1) to make simple work-related decisions; (2) to complete a normal work schedule and to work at a consistent pace; (3) to interact appropriately with the general public; (4) to ask questions or request assistance; (5) to accept instructions and

16 - FINDINGS & RECOMMENDATION

to respond appropriately to criticism from supervisors; (6) to get along with co-workers; (7) to maintain socially appropriate behavior; (8) to adhere to basic standards of neatness and cleanliness; (9) to respond to appropriate changes in the work setting; (10) to be aware of normal hazards and take appropriate precautions; (11) to travel in unfamiliar places or use public transportation; and (12) to set realistic goals or make independent plans.  Tr. 614-15.

On December 13, 2002, plaintiff was evaluated by psychologist James Bryan, Ph.D.  Tr. 684-98.  Like Dr. Tinker, Dr. Bryan administered several tests to plaintiff in addition to interviewing her.  Id.  Dr. Bryan indicated that his evaluation was requested as a follow-up to Dr. Tinker's, upon request of the Disability Services Office medical review team because of questions regarding "the accuracy of previous diagnoses, particularly in terms of Ms. Gill's credibility in symptom reporting, and the possibility of her malingering."  Tr. 685.

Dr. Bryan administered the Test of Memory Malingering (TOMM) to measure response validity.  Tr. 691.  He noted that plaintiff's scores were "consistent with, at best, lack of interest or effort, and more likely deliberate under-performance on this measure."  Id. He stated that there was a high probability that low scores on other cognitive measures represent "motivated under-performance." Id. Dr. Bryan began the conclusion and recommendation section of his report by noting that "[n]o clear diagnostic conclusions can be drawn, given plaintiff's invalid engagement on intellectual and cognitive . . . "  Tr. 692.  The next page is almost entirely unreadable due to some type of printing error.  Tr. 693.  However,

17 - FINDINGS & RECOMMENDATION

1  it appears that Dr. Bryan may have noted a provisional diagnosis of
2  malingering, but that some limitations persisted.  Id.

3       On April 28, 2003, Family Nurse Practitioner Ijeoma Nwerem,
4  wrote that plaintiff was currently a patient of Project Network,
5  and was currently undergoing treatment with Nwerem for depression,
6  anxiety, and bipolar disorder.  Tr. 587.  That same date, Kolokolo
7  wrote a letter indicating that plaintiff had a mental health
8  diagnosis of PTSD and depression NOS.  Tr. 588.  Kolokolo noted
9  that plaintiff had been reevaluated by the "Psych RN" and recently
10 started on new medication to help with keeping her mood balanced.
11 Id.  Kolokolo also reported that plaintiff demonstrated limited
12 ability to deal with stress and recently told staff that she felt
13 like hurting herself.  Id.  She was put on a "no self-harm
14 contract."  Id.  Kolokolo noted plaintiff's limited coping skills
15 and difficulty with self-soothing techniques and problem solving
16 skills.  Id.  Due to her mental health issues, she had difficulty
17 in finding housing, employment and in her ability to make sound
18 decisions.  Id.

19      On August 29, 2003, plaintiff was seen by someone at Cascadia
20 because of an "urge to use," and irritability.  Tr. 703.  Although
21 there are additional remarks written in the "presenting problem"
22 section of the assessment, they are illegible.  Id.  The impression
23 of the clinician, whose name is also illegible, was PTSD.  Id.  In
24 a typewritten note dated that same day, Alison Noice, "QMHP"
25 reported that plaintiff felt anxious, was experiencing an increase
26 in agitation and restlessness, and was irritable and short-
27 tempered.  Tr. 701.  Plaintiff also reported diminished sleep and
28 appetite, as well as trouble concentrating.  Id.  Plaintiff was

1   prescribed two medications:  Geodon and Seroquel[7].  Tr. 702.

2       On September 30, 2003, plaintiff was seen at the Providence
3   Ambulatory Care & Education Center as a new patient and to
4   establish a relationship with a primary care provider.  Tr. 728.
5   In the history and physical section, it is noted that plaintiff
6   presented with severe depression, was currently homeless, and
7   related a history of bipolar disorder, depression, and
8   polysubstance abuse.  Tr. 728.  She brought an empty bottle of
9   Seroquel.  Id.

10      The medical chart suggests that both attending physician Dr.
11  Pamela Bullock, M.D., and resident/student Karyn Ofa, D.O.,
12  examined plaintiff.  Tr. 730.  Their assessment was that plaintiff
13  suffered from bipolar disorder, currently in a major depression,
14  and possibly schizotypical.  Id.  Her Seroquel was refilled.  Id.
15  She met with a social services worker during the visit.  Plaintiff
16  did not want hospitalization and she agreed to a verbal no-harm
17  contract.  Id.  She was given an antibiotic for a possible urinary
18  tract infection and told to return in two days.  Id.

19      Chart notes from Cascadia dated November 18, 2003, show that
20  plaintiff complained of a depressed mood and a relapse on cocaine
21  four days prior.  Tr. 793.  She was crying and tearful and
22  requested hospitalization.  Id.  She was given more Geodon and
23  Seroquel and was sent to the emergency department at Woodland Park
24  Hospital for evaluation.  Id.

25      On December 16, 2003, plaintiff went back to Cascadia
26
27
28      [7]  Both of these drugs are antipsychotic medications used to
     treat schizophrenia and bipolar disorder.  www.drugs.com

19 - FINDINGS & RECOMMENDATION

1   requesting medication.  Tr. 841.  She explained that she had not

2   presented to the Woodland Park emergency room the previous month,

3   but had gone with her daughter to Seattle.  Id.  A medication

4   management sheet from Cascadia indicates that the Geodon and

5   Seroquel were renewed again on December 16, 2003.  Tr. 794.

6       On May 25, 2004, plaintiff underwent a psychological

7   evaluation by psychologist Frank P. Colistro, Ed.D.  Tr. 798-800.

8   Plaintiff was referred by Disabled Services to assist in

9   determining whether she suffered from psychological problems

10  constituting a substantial impairment of employability.  Tr. 798.

11  Dr. Colistro noted that Cascadia's December 16, 2003 progress notes

12  showed that plaintiff was seen on that date and was described as

13  having been clean and sober since November 14, 2003.  Id.  He also

14  noted that she was placed on anti-depressant medication.  Id.

15      Dr. Colistro stated that plaintiff reported taking the

16  medication as prescribed by Cascadia, but running out three days

17  prior to her evaluation with Dr. Colistro.  Id.  He noted that she

18  appeared highly agitated and tearful throughout his contact with

19  her, "expressing herself in a markedly rambling and tangential

20  fashion."  Tr. 799.  She appeared to be attending to internal

21  stimuli, and talked about being plagued by voices which command her

22  to harm herself.  Id.  Her statements reflected a high degree of

23  apparently delusional suspiciousness and mistrustfulness.  Id.  She

24  reported that she had not relapsed into drug or alcohol use, but

25  she admitted her past substance abuse problems.  Id.

26      Dr. Colistro administered the Weschler Adult Intelligence

27  Scale-III (WAIS-III) and the Minnesota Multiphasic Personality

28  Inventory-2 (MMPI-2).  Id.  Results were not reported because

20 - FINDINGS & RECOMMENDATION

1  plaintiff was so "obviously agitated and inattentive" that results
2  could not possibly be valid.  Id.

3      Dr. Colistro determined that plaintiff's diagnoses were (1)
4  depression, recurrent, severe with psychotic features; (2) panic
5  disorder without agoraphobia; (3) polysubstance dependence/abuse,
6  by history, reported in full remission; and (4) personality
7  disorder with dependent and inadequate features.  Tr. 800.

8      Dr. Colistro stated that plaintiff presented with signs and
9  symptoms of major affective, anxiety-related and characterologic
10 problems which exerted a "profoundly negative impact on functioning
11 in all areas."  Id.  He noted that her depression was reflected in
12 symptoms including anergia, anhedonia, onset and middle insomnia,
13 feelings of guilt and worthlessness, psychomotor agitation,
14 difficulty concentrating, history of suicidality, and paranoid
15 delusions and auditory hallucinations.  Id.

16     Her anxiety-related disorder was reflected in "recurrent
17 severe panic attacks manifested by a sudden unpredictable onset of
18 intense apprehension, fear, terror, and sense of impending doom
19 occurring on the average of at least one a week."  Id.  He noted
20 that she previously had been diagnosed as suffering from PTSD.  Id.
21 He further noted that her personality disorder was reflected in
22 seclusiveness, pathologically inappropriate suspiciousness, and
23 persistent disturbance of mood and affect.  Id.

24     Dr. Colistro opined that the combined impact of plaintiff's
25 condition resulted in marked restriction of activities of daily
26 living and marked difficulties in maintaining social functioning.
27 Id.  He noted that deficiencies of concentration, persistence or
28 pace resulting in a failure to complete tasks in a timely manner in

21 - FINDINGS & RECOMMENDATION

1  work settings and elsewhere, were occurring constantly, as were
2  "episodes of deterioration or decompensation in work or worklike
3  settings which have caused her to withdraw from these and to
4  experience exacerbation of signs and symptoms of her conditions,
5  especially anxiety and depression." Id.  He indicated that her
6  conditions had lasted for at least one year and would "persist for
7  that long and beyond." Id.  He further indicated that she was not
8  capable of managing her own funds.  Id.

9       In a "Rating of Impairment Severity Report," Dr. Colistro
10 found plaintiff markedly restricted in the following categories:
11 (1) activities of daily living; (2) social functioning; and (3)
12 concentration, persistence, or pace.  Tr. 801.  As support for his
13 ratings, he noted that plaintiff was a chronically mentally ill
14 patient, who was severely depressed, lived in the streets, with her
15 state caseworker her only support.  Id.  He also noted that she
16 reported avoiding social interactions with all others except her
17 caseworker.  Id.  He further indicated that he observed her on that
18 date to be so distraught and agitated that she was unable to
19 participate in a mental status examination, was marginally able to
20 provide an adequate history, and was unable to generate valid
21 psychologic test results.  Id.

22      In this report, Dr. Colistro also noted that plaintiff had
23 experienced four or more episodes of decompensation over a twelve-
24 month period prior to assessment.  Tr. 801-02.  He based this on
25 plaintiff's report of a lifelong history of major decompensation in
26 work settings, even when the work setting is low stress.  Tr. 802.

27      On August 3, 2004, plaintiff was seen by staff at Cascadia.
28 Tr. 862.  According to the Adult Behavioral Assessment of that

22 - FINDINGS & RECOMMENDATION

date, signed by Amy Daviau, M.S.W., plaintiff reported not having taken medications in six months because she lost her health coverage and stopped receiving services.  Tr. 863.  Plaintiff was homeless at the time, and reported being homeless for more than one year.  Id.  Plaintiff reported that she had a history of bipolar disorder, PTSD, and schizophrenia.  Id.  She also reported feeling helpless and having problems with sleep.  Id.  She had difficulty answering questions regarding her current risk of suicide.  Id.  She presented with motor abnormalities including body rocking and facial grimaces.  Id.  She was not a good historian.  Id.  She endorsed hearing voices, but did not give details about content or frequency.  Id.

In the physical health section, current medical issues of Hepatitis-C, history of migraines, arthritis, and carpal tunnel, were noted.  Tr. 865.  Plaintiff also remarked that she did not get enough to eat.  Id.

Daviau's diagnostic impressions were bipolar disorder, PTSD, schizophrenia, rule out alcohol abuse or dependence, history of migraines, Hepatitis-C, and arthritis.  Tr. 866.  She also noted plaintiff's inadequate finances, homelessness, and inadequate support system.  Id.  She assessed plaintiff as having a GAF of 43.  Id.

In an August 3, 2004 Treatment Plan, Daviau states that plaintiff will be given "bridge" medications to last until she could be seen for a full medication evaluation.  Tr. 868.  Plaintiff was to take the medication as prescribed and attend monthly "LMP" meetings.  Id.  Plaintiff was to be evaluated for drug and alcohol use and follow suggested treatment.  Id.  She was

23 - FINDINGS & RECOMMENDATION

1  to be referred to a housing specialist.  Id.

2      On September 10, 2004, plaintiff was given a psychiatric

3  evaluation by Cascadia's Jack Pladel, a psychiatric mental health

4  nurse practitioner.  Tr. 855-58.  Pladel described plaintiff as

5  clean and well groomed, but obviously dysphoric and depressed.  Tr.

6  856.  Plaintiff was tearful at times.  Id.  Her affect was "full

7  range" and there was severe poverty of content and paucity of

8  speech to her narrative.  Id.  There was poor, if any, eye contact.

9  Id.  She rocked back and forth in a chair and had a fair amount of

10  anxiety.  Id.  Her speech was of low intonation and low volume and

11  was difficult to track at times.  Id.  She looked anxious and

12  upset.  Id.  Recent and remote memory was not tested.  Id.

13      Pladel's initial diagnostic impressions were (1) alcohol

14  dependence in early sustained remission; (2) cocaine dependence in

15  sustained remission, (3) cannabis dependence in sustained

16  remission; (4) provisional - PTSD, chronic; (5) rule out major

17  depressive disorder, recurrent with psychotic features; (6) rule

18  out mood disorder nos; (7) history of migraines; (8) Hepatitis-C;

19  (9) arthritis; and (10) chronic neck and back pain.  Id.  He

20  assessed her current GAF as 30.  Id.

21      Pladel changed some of plaintiff's medications, had plaintiff

22  agree to a no-harm contract, and scheduled her to return in three

23  weeks.  Tr. 858.

24      It does not appear that plaintiff returned to see Pladel in

25  late September or early October.  She apparently called Cascadia

26  on November 8, 2004, expressing a desire to be engaged in more

27  services.  Tr. 853.  Cascadia staff spoke to her about her needs

28  and requested that she come to the "HARTS" group.  Id.

24 - FINDINGS & RECOMMENDATION

1    On January 14, 2005, plaintiff returned to Cascadia. Tr. 851.
2   Her engagement in services was discussed and she was given a group
3   schedule and a time for "housing walk in." Id. Plaintiff was then
4   seen by Pladel. Tr. 852. He noted that she reported that she had
5   been released two to three months earlier from the King County jail
6   in Seattle, and that she had not been on medications while in
7   jail.[8] Id.

8    She appeared ill, with a productive cough, malaise, sniffs,
9   and rhinitis.    Id.   Pladel assessed her as currently having an
10  upper respiratory infection of pneumonia or bronchitis.    Id.   He
11  planed on having her resume her medications and gave her samples.
12  Id. He instructed her to return in five days to pick up more.    Id.
13  II.  Plaintiff's Testimony at 2005 Hearing

14    The initial line of questioning at this hearing concerned
15  plaintiff's work history.  Plaintiff testified that she had no
16  memory of performing work in 2000 which generated approximately
17  $5,200 in earnings that year.  Tr. 927, 929.  She also does not
18  remember jobs producing approximately $1,000 in the couple of years
19  after that.  Id.  She has no memory of doing any work at all in the
20  four or five years before the hearing.   Id.

21    Plaintiff testified that she was unsure if she currently had
22  health insurance.   Tr. 930.   She explained that she had not
23  received mail and that when she went to Cascadia to try to get
24  medications and sign up for a counselor, they told her she did not
25  have any medical coverage.  Id. Plaintiff testified that Aging and

26

27

28    [8]  The record does not reveal the reason for this
     incarceration or its duration.

1  Disability Services thought she had coverage, but Cascadia did not.
2  Tr. 931.

3       Plaintiff stated she was homeless and had been for over a
4  year.  Id.  She stayed in abandoned cars and houses.  Id.  Before
5  that, she lived on and off with her abusive ex-husband.  Tr. 932.
6  She received her mail at her mother's house, but she did not stay
7  with her mother because of plaintiff's "issues."  Id.  She goes
8  months without talking to or seeing her mother.  Id.

9        Between the time of the first hearing in October 2003, and
10 the hearing in September 2005, plaintiff stated that she had
11 received medications from Cascadia.  Tr. 933.

12      Plaintiff explained that in the past, the medications she had
13 taken to address her mental illness included Geodon, Seroquel,
14 Zoloft, trazodone, and diazepam.  Tr. 931.  At the time of the
15 hearing, she had not received medications in the last four or five
16 months because she had no money to buy them.  Tr. 934.

17      She testified she was still hearing voices once in awhile.
18 Id.  She spent her days sitting in cars or sitting in an abandoned
19 house.  Tr. 935.  When hungry, she begs for food or sometimes
20 steals.  Id.

21      Plaintiff stated that she last used alcohol two days before
22 the hearing.  Id.  She drank an eight or twelve ounce can of beer.
23 Id.  Prior to that, it had been about four months since she had
24 alcohol.  Tr. 936.  It had been about seven months since she last
25 used cocaine.  Id.

26      In regard to her Hepatitis-C, plaintiff stated that she was
27 constantly tired and fatigued and this continued to worsen.  Tr.
28 937.  She also weighed sixty to seventy pounds less than she had at

26 - FINDINGS & RECOMMENDATION

1  the 2003 hearing because she does not eat very often.  Id.

2  III.  Medical Expert Testimony at 2005 Hearing

3      Psychologist Dr. Sally Clayton testified at the hearing.  Tr.

4  938-55.  Clayton initially diagnosed plaintiff with mild mental

5  retardation, chronic PTSD, and personality disorder nos.  Tr. 939-

6  41.  Dr. Clayton assessed plaintiff as having marked impairment in

7  activities of daily living, social functioning, and concentration,

8  persistence, and pace.  Tr. 942.  This opinion was with

9  consideration of plaintiff's substance abuse.  Id.  Dr. Clayton

10 also opined that there was insufficient evidence to assess

11 plaintiff's episodes of decompensation.  Id.

12     Without substance abuse, Dr. Clayton opined that plaintiff

13 would be mildly impaired in her activities of daily living,

14 moderately impaired in social functioning, and markedly impaired in

15 concentration, persistence, and pace.  Tr. 943.  This assessment,

16 however, was based on her assumption that medication to treat

17 plaintiff's PTSD was available to her.  Id.  Without such

18 medication, Dr. Clayton considered plaintiff to be markedly

19 impaired in social functioning.  Id.

20     Upon questioning by the ALJ, and a review of the 1999

21 psychological evaluation by Dr. Jenkins, Dr. Clayton reconsidered

22 her diagnoses and retracted her mild mental retardation diagnosis.

23 Tr. 947.  Dr. Clayton explained that plaintiff probably has a

24 learning disability in math at least, and that one could

25 "generously say the borderline range of intellectual functioning."

26 Id.  However, when the ALJ then immediately asked Dr. Clayton

27 directly if she would drop the diagnosis of borderline IQ that she

28 just assessed, Dr. Clayton responded "yes," which contradicts the

27 - FINDINGS & RECOMMENDATION

1  statement she had just made.  Id.

2      With this, Dr. Clayton then revised her impairment assessment

3  and stated that without substance abuse, she would consider

4  plaintiff to have a moderate impairment in concentration,

5  persistence, and pace.  Id.

6  IV.  Vocational Expert Testimony at 2005 Hearing

7      Vocational Expert (VE) Patricia Ayerza testified at the

8  hearing.  Tr. 956-59.  The ALJ presented Ayerza with the following

9  hypothetical:  a worker with the same educational and vocational

10  background as plaintiff, limited to simple, routine, repetitive

11  work, no exposure to any hazardous conditions, and limited to light

12  to medium levels of exertion.  Tr. 956.  Additional limitations

13  were occasional use of ropes, ladders or scaffolds, occasional

14  crawling or reaching, no interaction with the public, and

15  occasional co-worker interaction.  Id.  The ALJ also added that

16  deficiencies of concentration, persistence, and pace would

17  interfere with the completion of tasks in a timely manner up to

18  one-third of the workday.  Tr. 957.

19      In response to this hypothetical, the VE testified that there

20  were no jobs in the local or national economy that this

21  hypothetical worker could sustain on a competitive basis.  Id.

22      In response to questions by plaintiff's counsel, the VE

23  testified that missing work a couple of days each month on a fairly

24  consistent basis due to anxiety or paranoia would also preclude

25  competitive employment.  Id.

26                    THE ALJ'S 2005 DECISION

27      The ALJ found that plaintiff had not engaged in any

28  substantial gainful activity at any time since her protective

28 - FINDINGS & RECOMMENDATION

filing date of December 10, 2001. Tr. 111. He then determined that she suffers from severe impairments of degenerative disc disease, Hepatitis-C, anxiety-related disorder, personality disorder, and substance addiction disorder, in partial remission. Id.

Later, the ALJ elaborated on plaintiff's severe impairments and explained that having considered listed impairments 1.04 (disorders of the spine), 5.05 (Hepatitis-C), 12.05 (mental retardation), 12.06 (anxiety-related disorders), and 12.08 (personality disorders), absent drug or alcohol abuse, claimant had medically determinable impairments of mild degenerative disc disease of the cervical-lumbar spine, Hepatitis-C, mild mental retardation, anxiety/posttraumatic stress disorder, and a personality disorder. Tr. 117. While the ALJ found the impairments to be collectively severe, he also found that they did not meet or medically equal a listed impairment. Id.

Next, the ALJ considered plaintiff's residual functional capacity (RFC). The ALJ concluded that plaintiff had the physical capacity for medium level exertional work, plus postural, manipulative, and vocational non-exertional limitations. Tr. 119. First, he found that she could lift and carry up to twenty-five pounds frequently and up to fifty-pounds occasionally. Id. Next, he found she could sit occasionally for two hours (cumulatively, not continuously), in an eight-hour workday with normal breaks. Id. She could also perform prolonged standing and walking for six hours (cumulatively, not continuously), in an eight-hour workday with normal breaks. Id. Her push/pull exertional capacities, in her upper and lower extremities, are limited to those weight levels

29 - FINDINGS & RECOMMENDATION

1  that she can lift and carry.  Id.

2      The ALJ further found that plaintiff can climb stairs and
3  ramps but was limited to no more than occasional climbing of ropes,
4  ladders, and scaffolding, and no more than occasional crawling.
5  Id.  She was also limited to no more than occasional reaching in
6  all directions.  Id.

7      Finally, the ALJ concluded that absent drug and alcohol abuse,
8  plaintiff's non-exertional limitations restricted her to no more
9  than simple, repetitive, routine work, with no public contact and
10 only occasional contact with co-workers.  Id.  He further noted
11 that when plaintiff has no access to medications, she has an
12 additional limitation precluding her from basic work activities.
13 Id.  He explained, however, that he did not find evidence that
14 plaintiff would be deprived of medications for any prolonged period
15 of time, except for willful non-compliance with treatment or
16 medication requirements.  Id.

17     The ALJ next determined if there was other work, existing in
18 significant numbers in the regional and national economy, that
19 plaintiff could perform.  Tr. 120.  Based upon testimony from the
20 VE at the first hearing in October 2003, the ALJ concluded that she
21 could perform the jobs of janitor and laundry worker.  Id.
22 Accordingly, he concluded that plaintiff was not disabled.  Id.

23              STANDARD OF REVIEW & SEQUENTIAL EVALUATION

24     A claimant is disabled if unable to "engage in any substantial
25 gainful activity by reason of any medically determinable physical
26 or mental impairment which . . . has lasted or can be expected to
27 last for a continuous period of not less than 12 months[.]"  42
28 U.S.C. § 423(d)(1)(A).  Disability claims are evaluated according

30 - FINDINGS & RECOMMENDATION

to a five-step procedure. <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1395 (9th Cir. 1991).   The claimant bears the burden of proving disability.   <u>Swenson v. Sullivan</u>, 876 F.2d 683, 687 (9th Cir. 1989).   First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."   If so, the claimant is not disabled.   <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).   In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."   <u>Yuckert</u>, 482 U.S. at 140-41; <u>see</u> 20 C.F.R. §§ 404.1520(c), 416.920(c).   If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity."   <u>Yuckert</u>, 482 U.S. at 141; <u>see</u> 20 C.F.R. §§ 404.1520(d), 416.920(d).   If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four.   <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e).   If the claimant can, he is not disabled.   If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work.   <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).   If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled.   20 C.F.R. §§ 404.1566, 416.966.

31 - FINDINGS & RECOMMENDATION

1    The court may set aside the Commissioner's denial of benefits
2    only when the Commissioner's findings are based on legal error or
3    are not supported by substantial evidence in the record as a whole.
4    Baxter, 923 F.2d at 1394.  Substantial evidence means "more than a
5    mere scintilla," but "less than a preponderance."  Id.  It means
6    such relevant evidence as a reasonable mind might accept as
7    adequate to support a conclusion.  Id.

DISCUSSION

9    Plaintiff makes several arguments in support of her contention
10   that the ALJ's non-disability determination is erroneous.  The
11   arguments fall into seven categories:  (1) erroneous vocational
12   evidence; (2) failure to consider GAF scores; (3) error in
13   considering medical non-compliance; (4) improper legal standard;
14   (5) substance abuse materiality analysis; (6) improper rejection of
15   medical evidence; and (7) improper rejection of plaintiff's
16   testimony.

17   Because I find some of the arguments dispositive, I do not
18   address them all.

19   I.  Medical Non-Compliance

20   The ALJ first mentioned "non-compliance" when rejecting
21   Pladel's GAF score of 30.  Tr. 115.  There, the ALJ explained that
22   he gave Pladel's diagnosis and GAF score no weight because of
23   plaintiff's infrequent visits to Cascadia, "her admitted non-
24   compliance in taking her medications," and Pladel's assessment not
25   being co-signed or supervised by a clinical psychologist or
26   psychiatrist.  Id.

27   Later, while still discussing the severity of plaintiff's
28   impairments, the ALJ referred to plaintiff's September 2005

32 - FINDINGS & RECOMMENDATION

testimony that she had been without funds or medical insurance
coverage to obtain her mental health medications "for about the
last four months." Tr. 117. The ALJ explained that an inability
to obtain mental health medication would "adversely impact
[plaintiff's] capacity for concentration, persistence and pace, to
a 'marked' degree." Id. However, the ALJ found that plaintiff's
inability to obtain medications had existed for only four months,
eight months shy of the durational requirement of twelve continuous
months. Id. Additionally, the ALJ stated that plaintiff had
become "well-versed in being able to obtain at least samples of her
medication as needed" through Cascadia and most likely through
other sources as well, including the Oregon Health Plan, the County
Mental Health Clinic, and general assistance." Id. Thus, the ALJ
concluded that the potential for plaintiff to involuntarily be
without medications for twelve continuous months was not likely.
Id.

In the discussion of her RFC, the ALJ stated that when
plaintiff has no access to medications, she is precluded from basic
work activities. Tr. 119. Again, however, he noted that the
record did not support a finding that plaintiff would be deprived
of her medications for a prolonged period of time, such as for
twelve continuous months, except for willful non-compliance in
following through with treatment or medication requirements. Id.

As I understand the ALJ's decision, he found that without
access to her medications, plaintiff is disabled because she is
precluded from basic work activities. However, the ALJ concluded
that plaintiff was not disabled because (1) access to her
medications was due to her willful non-compliance; and (2) any

33 - FINDINGS & RECOMMENDATION

1   involuntary  inability  to  obtain  medications  did  not  meet  the
2   twelve-month durational requirement because although plaintiff did
3   not  appear  to  have  funds  or  health  insurance,  her  involuntary
4   inability  to  obtain  medications  had  lasted  only  four  months  and
5   plaintiff was "well versed" in obtaining her medications from other
6   sources.

7       Plaintiff argues that (1) the ALJ erred in concluding that her
8   failure  to  take  prescription  medication  is  due  to  willful  non-
9   compliance;  (2)  it  is  unreasonable  to  conclude  that  plaintiff's
10  erratic  medication  history  is  willful  non-compliance  given  the
11  differences between mental and physical impairments; (3) the ALJ
12  offers  no  evidence  to  support  his  speculation  that  medication
13  removes plaintiff's mental and psychological disorders; and (4) the
14  ALJ failed to comply with Social Security Ruling 82-59.

15      I agree with plaintiff that the ALJ erred in concluding that
16  substantial   evidence   shows   that   her   failure   to   take   her
17  prescription  mental  health  medications  is  due  to  willful  non-
18  compliance.   As  noted  above,  the  ALJ  referred  to  plaintiff's
19  "admitted non-compliance in taking her medications[.]"  Tr. 115.
20  But, I fail to see any discussion by the ALJ of the evidence
21  supporting this conclusion.

22      Before making this statement, the ALJ referred to plaintiff's
23  alleged intermittent visits to Cascadia in late 2003 to early 2005
24  in which she asked for medications.  For a mentally ill individual
25  with  no  health  insurance  and  no  funds,  intermittent  visits  to
26  obtain medications, without more, is not substantial evidence of
27  willful non-compliance in taking medications.

28      Moreover, the ALJ mistakenly indicates that plaintiff went to
34 - FINDINGS & RECOMMENDATION

Cascadia only three times in twenty-six months.  Tr. 115.  The
record shows that plaintiff received treatment from Cascadia on at
least six occasions in a seventeen-month period.  Tr. 703
(psychiatric assessment performed on August 29, 2003)[9]; Tr. 793
(progress note from Cascadia dated Nov. 18, 2003);  Tr. 794, 841
(progress note and medication record from Cascadia for December 15,
2003); Tr. 862 (progress note from Cascadia dated Aug. 3, 2004);
Tr. 855-58 (psychiatric evaluation by Pladel at Cascadia dated
Sept. 10, 2004); Tr. 851-52 (progress notes dated January 14,
2005).

Furthermore, caselaw supports plaintiff's position that non-
compliance with mental health treatment should be viewed
differently than non-compliance with recommended treatment for
physical ailments.  As the Sixth Circuit explained, "[a]ppellant
may have failed to seek psychiatric treatment for his mental
condition, but it is a questionable practice to chastise one with
a mental impairment for the exercise of poor judgment in seeking
rehabilitation."  Blankenship v. Bowen, 874 F.2d 1116, 1124 (6th
Cir. 1989).

Moreover, there is no basis in the record for the ALJ to find
that plaintiff can regularly obtain her required medications from
various sources such as charity (samples from Cascadia), the
County, or general assistance.  As plaintiff testified, at the time

---

[9]  While page 703 does not expressly state that it is a
record generated by Cascadia, other evidence in the record
indicates that it is a psychiatric assessment performed by
Cascadia staff.  Tr. 700 (indicating record on page 703 is from
Cascadia); Tr. 5 (listing pages 699-703 as medical records from
Cascadia).

of the September 2005 hearing, it was unclear if she had any health insurance.   Tr.   930-31.   There   does   not   appear   to   be   any affirmative evidence in the record demonstrating that she had health insurance or was enrolled in the Oregon Health Plan at that time.  Generally, the record contains scant evidence regarding her insured status.

The ALJ offers no basis in the record for his conclusion that a claimant with severe impairments such as plaintiff's and with no health insurance or funds, will be able to regularly obtain her required   psychiatric   medications   from   a   variety   of   diverse charitable or public sources.  Social Security Ruling (SSR) 82-59 (available at 1982 WL 31384), indicates that before relying on free community   resources   as   an   available   source   of   treatment, "[c]ontacts   with   such   resources   and   the   claimant's   financial circumstances   must   be   documented."    SSR 82-59.    This   seems particularly   appropriate   in   the   case   of   mental   impairment   as opposed   to   physical   impairment.    Here,   other   than   occasional receipt of samples from Cascadia, the record does not contain any information about the other resources named by the ALJ.  Thus, his conclusion that procuring sample medications from these resources is a viable treatment source is speculative and is not supported by substantial evidence in the record.

Without   substantial   evidence   in   the   record   to   support   his finding   that   plaintiff   is   willfully   non-compliant   with   her medications,   and   without   substantial   evidence   in   the   record   to support his finding that the twelve-month durational impairment is not met because plaintiff is able to obtain samples from various community   resources,   the   ALJ's   finding   is   that   plaintiff   is

36 - FINDINGS & RECOMMENDATION

1   disabled.    With  this,  the  case  should  be  remanded  for  a

2   determination of benefits.

3   II.   Rejection of Medical Evidence

4         Plaintiff  contends  that  the  ALJ  erred  in  rejecting  the

5   opinions  of  (1)  examining  psychologist  Dr.  Tinker;  (2)  examining

6   psychologist Dr. Colistro; and (3) medical expert Dr. Clayton.

7         A.   Dr. Tinker

8         The  ALJ  noted  that  in  October  2002,  Dr.  Tinker  assessed

9   plaintiff  with  diagnoses  of  bipolar  disorder,  PTSD,  cognitive

10  disorder,  mild  mental  retardation,  and  personality  disorder  with

11  alcohol  and  cocaine  dependence.    Tr.  113.    Later,  however,  the  ALJ

12  stated  that  he  gave  Dr.  Tinker's  opinion  little  weight  because  Dr.

13  Tinker  ignored  plaintiff's  drug  and  alcohol  history,  her  relapses,

14  and  the  effects  her  use  had  on  her  overall  mental  functioning.    Tr.

15  118.    The  ALJ  also  stated  that  "Dr.  Tinker  fails  to  give  any

16  rationale  for  his  opinion  and  fails  to  state  any  objective  evidence

17  to   support   such   an   opinion.     He   fails   to   administer   any

18  psychological  testing,  such  as  the  TOMM  or  MMPI  to  substantiate  the

19  claimant's  subjective  complaints[.]"   Tr.  119.

20          To reject an uncontradicted opinion of a treating or
        examining doctor, an ALJ must state clear and convincing
21      reasons that are supported by substantial evidence. . .
        . If  a  treating  or  examining  doctor's  opinion  is
22      contradicted by another doctor's opinion, an ALJ may only
        reject it by providing specific and legitimate reasons
23      that are supported by substantial evidence.

24  Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005) (citation

25  omitted).

26        The  ALJ's  first  reason  for  rejecting  Dr.  Tinker's  opinion

27  cannot be squared with the ALJ's own determination that plaintiff's

28

37 - FINDINGS & RECOMMENDATION

substance abuse is not material in the disability determination.[10]

Next, Dr. Tinker's report reveals that he completed a fairly extensive mental status examination over the course of two days. Tr. 607-10. Additionally, Dr. Tinker administered the following tests: (1) Shipley Institute of Living Scale, (2) WAIS-III, (3) Reitan-Indiana Aphasia Screening Tests, (4) Trial Making Test, (5) Hooper Visual Organization Test, (6) Bender Visual-Motor Gestalt Test, (7) Benton Revised Visual Retention Test, (8) Complex Figure Test, (9) Auditory-Verbal Learning Test, (10) Wechsler Memory Scale-Revised, (11) Wide Range Achievement Test-III, (12) Millon Clinical Multiaxial Inventory-III, (13) Beck Depression Inventory-II, and (14) Pain Apperception Test. Tr. 610-13.

The ALJ fails to adequately explain why the absence of two particular tests, the TOMM and the MMPI, would substantiate Dr. Tinker's conclusions while the thirteen different tests he did administer, do not. Without a thorough discussion of this issue, the argument put forth by the ALJ that Dr. Tinker's opinions have little weight because he failed to administer psychological testing or offer objective evidence in support of his opinion, is not supported by clear and convincing evidence or specific and legitimate reasons.

Dr. Tinker offers numerous conclusions regarding plaintiff's impairments and her functional capacity. Tr. 613-16. Without

_____

[10] The ALJ erred as well because Dr. Tinker (1) noted plaintiff's history of substance abuse in the first sentence of his report; Tr. 603; (2) gave details of her substance abuse in the background section of the report; Tr. 604; (3) noted her arrests for possession of a controlled substance; Tr. 605; and (4) noted her alcohol and cocaine dependence in his diagnostic impressions. Tr. 615.

38 - FINDINGS & RECOMMENDATION

identifying which specific opinions, the ALJ states that Dr.
Tinker's "opinions" are not supported by Dr. Jenkins, Dr. Bryan, or
Dr. Colistro, and further, that they are not endorsed by medical
experts Dr. Crossen or Dr. Clayton.

Dr. Jenkins believed it likely that plaintiff had a learning
disability or cognitive disorder and indicated that plaintiff's
intellectual functioning was borderline.  Tr. 355, 356.  This is
not obviously inconsistent with Dr. Tinker's conclusion that
plaintiff has mild mental retardation.  Tr. 615.

Dr. Bryan opined that based on her WAIS-III results,
plaintiff's intellectual capacity was in the extremely low
intellectual range, with a full scale IQ of 63.  Tr. 691.  This was
the same score reported by Dr. Tinker.  Tr. 610.

Dr. Colistro found that plaintiff was markedly limited in her
activities of daily living and in maintaining social functioning,
and had a constant deficiency of concentration, persistence, or
pace resulting in failure to complete tasks in a timely manner.
Tr. 800.  Dr. Tinker concluded that plaintiff was severely
restricted in her daily living skills, was markedly limited in her
ability to maintain socially appropriate behavior, and had severe
deficiencies of concentration, persistence, or pace that resulted
in a failure to complete tasks in a timely manner.  Tr. 614.

These examples demonstrate that substantial evidence does not
support the ALJ's conclusion that Dr. Tinker's opinions are not
supported by those of Dr. Jenkins, Dr. Bryan, or Dr. Colistro.

As for the two medical experts, Dr. Clayton discussed Dr.
Tinker's WAIS-III scoring and whether it was valid.  Dr. Clayton
started by stating that one of plaintiff's impairments was mild

39 - FINDINGS & RECOMMENDATION

1  mental retardation, based on the fact that plaintiff had taken "the
2  IQ test" on two different occasions and got pretty similar scores,
3  referring to the scores obtained by Dr. Tinker and Dr. Bryan.  Tr.
4  939.  The ALJ then asked if both were valid.  Id.  Dr. Clayton
5  responded that Dr. Tinker's assessment did not discuss validity
6  whereas  Dr.  Bryan  indicated  much  of  the  testing  was  not
7  interpretable.  Id.  She then noted that as to the WAIS-III,
8  however, Dr. Bryan stated that it represented a valid summary of
9  plaintiff's overall performance.  Id.

10     The ALJ pressed Dr. Clayton further and asked if Dr. Bryan
11  indicated that there was poor performance on testing.  Id.  Dr.
12  Clayton responded that Dr. Bryan had administered the TOMM and said
13  that at best, there was a lack of interest or effort and a high
14  probability that plaintiff was motivated to underperform.  Tr. 939-
15  40.  Still, Dr. Clayton reiterated, on the WAIS-III, Dr. Bryan
16  commented that that particular test was a valid summary of her
17  performance.  Tr. 940; see also Tr. 691 (Dr. Bryan's report noting
18  that  a  two-point  verbal  performance  IQ  difference  was  not
19  statistically significant such that the full scale IQ represented
20  a valid summary of her overall performance).  Dr. Clayton also
21  reiterated that Dr. Tinker did not indicate that the WAIS-III test
22  her administered was invalid.  Tr. 941.

23     Later in the hearing, the ALJ referred to Dr. Jenkins's 1999
24  evaluation and plaintiff's verbal IQ score of 84 at that time.  Tr.
25  945; see also Tr. 355 (test scores recited in Dr. Jenkins's
26
27
28

40 - FINDINGS & RECOMMENDATION

report).[11]  Dr. Clayton indicated that although she had reviewed Dr. Jenkins's report, she had neglected to include it in her summary and upon examining it again, she might have to omit mild mental retardation as a diagnosis.  Tr. 946.  However, she agreed with the ALJ that the performance and full scale IQ scores were in the mid-70s and noted that Dr. Jenkins herself reported that plaintiff's scores fell within a borderline intellectual functioning range. Tr. 947.  Dr. Clayton then indicated that while she was withdrawing her finding of mild mental retardation, she "could generously say [that plaintiff fell in] the borderline range of intellectual functioning."  Id.  The ALJ then asked her if she would drop the diagnosis of "borderline IQ," and Dr. Clayton responded that she would.  This contradicts the statement she had just made.

In my reading of the testimony, Dr. Clayton's discussion of Dr. Tinker's assessment, her repeated statements that Dr. Tinker made no reference to the WAIS-III score being invalid, and her interpretation of Dr. Bryan's report that while other tests he administered suggested plaintiff may have been exaggerating, the WAIS-III score was nonetheless a valid summary, are supportive of Dr. Tinker's conclusion of mild mental retardation.

Moreover, as discussed further below, Dr. Clayton's opinions regarding plaintiff's functional limitations are similar to Dr. Tinker's in some aspects.  She concluded that without medication, plaintiff's social functioning was markedly impaired.  Tr. 943.

_____

[11]  Curiously, neither the ALJ nor Dr. Clayton noted that Dr. Jenkins administered the WAIS-Revised (WAIS-R), not the WAIS-III.  Thus, it is unclear from the record whether the scores from Dr. Jenkins's testing are even comparable to the scores from Dr. Tinker's or Dr. Bryan's testing.

41 - FINDINGS & RECOMMENDATION

1  She also concluded that with a diagnosis of mild mental
2  retardation, plaintiff had marked impairment in concentration,
3  persistence, and pace, even absent drug and alcohol use.  Tr. 943.
4  These findings are consistent with Dr. Tinker's findings.  Thus,
5  the evidence does not support the ALJ's conclusion that Dr. Clayton
6  did not endorse Dr. Tinker's opinions.

7      Medical expert Dr. Crossen, who testified at the October 30,
8  2003 hearing, discounted Dr. Tinker's assessment because there was
9  no assessment of the validity of plaintiff's self-report.  Tr. 914.
10  He stated that Dr. Tinker "comes up with a mild mental retardation
11  diagnosis."  Id.  He opined that Dr. Tinker's evaluation was an
12  "unpenetrating psychological assessment."  Tr. 915.  He noted that
13  the extremely low scores are "red flags for flat out malingering."
14  Id.

15      The problem with relying on Dr. Crossen's testimony as the
16  basis for rejecting Dr. Tinker's testimony is that "[t]he opinion
17  of a non-examining medical expert, with nothing more, is not
18  substantial evidence sufficient to support a denial where the
19  record contains conflicting observations, opinions and conclusions
20  of an examining physician."  Stark v. Shalala, 886 F. Supp. 733,
21  735 (D. Or. 1995); see also Lester v. Chater, 81 F.3d 821, 831 (9th
22  Cir. 1995) ("The opinion of a nonexamining physician cannot by
23  itself constitute substantial evidence that justifies the rejection
24  of the opinion of either an examining physician or a treating
25  physician.").

26      Ninth Circuit law recognizes that a non-examining physician's
27  opinion may constitute substantial evidence if it is consistent
28  with other independent evidence in the record.  Thomas v. Barnhart,

42 - FINDINGS & RECOMMENDATION

278 F.3d 947, 957 (9th Cir. 2002).  Here, the ALJ does not identify which of the many of Dr. Tinker's opinions he found unsupported by the medical experts.  As seen from the discussion above, some of Dr. Tinker's opinions are supported by other examining psychologists and thus, other independent evidence in the record is consistent with Dr. Tinker's assessment, not the medical expert's.

As to Dr. Crossen's testimony, the only evidence in the record that could provide support for a finding of malingering is a provisional diagnosis by Dr. Bryan.  Dr. Bryan noted that plaintiff's TOMM test results showed at best, lack of interest or effort and more likely deliberate under-performance.  Tr. 691.  He also stated that there was a high probability that low scores on other cognitive measures represented motivated under-performance. Id.  In discussing her MMPI-2 profile, Dr. Bryan noted that her responses indicated extreme over-reporting and exaggeration of her symptomatology.  Tr. 692.

Dr. Bryan's conclusions are practically undecipherable due to an obvious photocopying error.  Tr. 693.  The likely references to malingering, however, are followed by the word "provisionally." Id.  Also, Dr. Bryan's conclusions do not rule out Dr. Bryan nonetheless finding that plaintiff is suffering from various impairments or having certain functional limitations, notwithstanding his concerns about her overreporting and exaggeration of her symptoms.  The record in its present state, with equivocal conclusions from Dr. Bryan, does not provide sufficient support for Dr. Crossen's opinion so as to constitute substantial evidence for the rejection of Dr. Tinker's opinion.
/ / /

43 - FINDINGS & RECOMMENDATION

1    B.  Dr. Colistro

2        The ALJ gave Dr. Colistro's May 25, 2004 assessment no weight.

3    Tr. 115.   The ALJ explained that Dr. Colistro's assessment of

4    marked   limitations   in   (1)   activities   of   daily   living,   (2)

5    socialization, and (3) concentration, persistence, and pace, were

6    not supported by "evidence anywhere in the record."   Id.   This

7    conclusion by the ALJ is not supported by the record.   Dr. Tinker

8    also assessed plaintiff with several marked limitations.   Tr. 614-

9    15.  Dr. Clayton did as well.  Tr. 942-43.  Additionally, some of

10   the GAF scores suggest marked limitations.  E.g., Tr. 840 (GAF 50

11   assessed by  social  worker  Cynthia  Eckersey  on  March  18,  2002,

12   which, according to the Diagnostic & Statistical Manual of Mental

13   Disorders, Revised  34  (4th  ed.  2000)  ("DSM-IV-R"),  indicates

14   serious  symptoms  (suicidal  ideation,  severe  obsessional  rituals,

15   frequent  shoplifting),  or  any  serious  impairment  in  social,

16   occupational, or school functioning (no friends, unable to keep a

17   job); Tr. 617 (GAF of 38 by Kolokolo on August 20, 2002 indicating,

18   under  the  DSM-IV-R  "[s]ome  impairment  in  reality  testing  or

19   communication  (e.g.  speech  is  at  times  illogical,  obscure,  or

20   irrelevant) OR major impairment in several areas, such as work or

21   school,  family  relations,  judgment,  thinking,  or  mood  (e.g.

22   depressed man avoids friends, neglects family, and is unable to

23   work; child frequently beats up younger children, is defiant at

24   home, and is failing at school)"; Tr. 616 (GAF of 21 assessed by

25   Dr. Tinker on October 6, 2002, indicating, under the DSM-IV-R,

26   behavior considerably influenced by delusions or hallucinations or

27   serious  impairment  in  communication  or  judgment  (sometimes

28   incoherent, acts grossly inappropriately, suicidal preoccupation),

44 - FINDINGS & RECOMMENDATION

1   or an inability to function in almost all areas (stays in bed all
2   day; no job, home, or friends).

3       The ALJ further explained that Dr. Colistro himself noted that
4   the objective testing results were invalid.  Id.  Dr. Colistro's
5   assessment was based on his review of plaintiff's records from
6   Cascadia and his mental status exam of plaintiff.  Tr. 798-800.
7   Dr. Colistro explained that while he administered the WAIS-III and
8   the MMPI-2, the test results were not valid because on the day he
9   evaluated plaintiff and administered the tests, plaintiff was so
10  obviously agitated and inattentive that the results could not be
11  valid.

12      The fact that the test results from these two tests were
13  invalid because of plaintiff's mental and emotional state on the
14  day they were administered is not a basis for rejecting Dr.
15  Colistro's report when he did not base his assessment on those test
16  results.   The  inability  of  a  claimant  due  to  her  mental
17  disabilities to provide valid objective test results on a given
18  day,  does  not,  in  and  of  itself,  discredit  Dr.  Colistro's
19  assessment.  This assessment is also supported by Dr. Colistro's
20  review of the treating provider's records.

21      The ALJ's additional reasoning regarding his rejection of Dr.
22  Colistro's assessment is a bit unclear.  Tr. 115.  The ALJ appears
23  to suggest that Dr. Colistro's reliance on the notes from Cascadia
24  are not reliable because those notes reflect only walk-in visits
25  three  times  over  a  twenty-six-month  period:   November  2003,
26  September 2004, and January 2005.  Id.

27      But, as  described above, the record shows that plaintiff
28  received treatment from Cascadia on at least six occasions in a

45 - FINDINGS & RECOMMENDATION

seventeen month period. Tr. 703, 793, 794, 841, 862, 851-52.[12] Thus, the record does not support the ALJ's suggestion that Cascadia's records are unworthy of reliance because plaintiff's treatment there was sporadic.

Next, the ALJ indicates that Dr. Colistro's reliance on plaintiff's self-reports is inappropriate because plaintiff's report to Dr. Colistro of taking her medications regularly is, according to the ALJ, an "indisputable fabrication" as plaintiff "repeatedly returns to Cascadia for re-initiation of her medications after extensively long periods of going without medications." Tr. 115.

Dr. Colistro reported on May 25, 2004, that plaintiff told him that "[s]he has been taking her medication as prescribed by Cascadia regularly, but says that she ran out three days ago." Tr. 798. The record shows that plaintiff obtained medications from Cascadia in August 2003, November 2003, and December 2003. Tr. 794. The first of these medication dispensations indicates that plaintiff received 30-60 days of medications. Id. The other two dispensations do not indicate the number of pills prescribed. Thus, the record does not reveal how many days or months of medications plaintiff received in December 2003. There is also no

---

[12] Dr. Colistro's assessment is dated May 2004. It is unclear why the ALJ recited the Cascadia treatment dates of September 2004 and January 2005 when they obviously post-date Dr. Colistro's assessment. However, since the ALJ saw fit to note the post-assessment dates, I do as well.

Additionally, when records of Network Behavioral Healthcare are included as part of Cascadia Behavioral Healthcare, the record indicates that plaintiff was seen in January, March, and May of 2002 as well. Tr. 592-93, 596-97, 598, 601-02, 683.

1  way to tell if she received medications from other sources as the
2  ALJ suggests she is adept at doing.   As a result, Cascadia's
3  records, and the record generally, do not provide substantial
4  evidence for a finding that plaintiff's report regarding her
5  regular taking of medications prescribed by Cascadia, was untrue.[13]

6      Finally, the ALJ rejected Dr. Colistro's assessment that
7  plaintiff had multiple decompensations in work or work-like
8  activities because, the ALJ noted, plaintiff has no past relevant
9  work.   Tr. 115.   The ALJ himself, however, stated four pages
10  earlier, that plaintiff had past relevant work as a childcare
11  attendant. Tr. 111. The ALJ's basis for rejecting Dr. Colistro's
12  assessment regarding decompensations is contradicted by the ALJ's
13  own decision.

14      Additionally, plaintiff reported to Dr. Colistro that she had
15  no significant work history, but that she had worked at McDonald's,
16  an anodizing company, and doing in-home childcare, without success
17  due to increased depression, agitation, panic and confusion.   Tr.
18  799.   She specifically noted that interpersonal problems had
19  triggered episodes of emotional decompensation in those situations.
20  Thus, there was evidence, by plaintiff's self-report that the ALJ
21  has not sufficiently rejected, of some attempts at work, albeit not
22  amounting to a significant work history.

23      C.  Dr. Clayton

24      Plaintiff next argues that the ALJ improperly rejected medical
25  expert Dr. Clayton's assessments which plaintiff argues establish
26  that she is disabled.   Dr. Clayton initially opined that absent

27  _____

28      [13]  Moreover, in a recent case, the Ninth Circuit noted that

47 - FINDINGS & RECOMMENDATION

1  substance  abuse,  plaintiff  would  have  marked  impairment  in
2  maintaining concentration, persistence, or pace.  Tr. 943.  She
3  based this on a combination of plaintiff's cognitive impairments
4  and anxiety.  Id.  Dr. Clayton also stated that without access to
5  medication for her PTSD, plaintiff's social functioning would be
6  markedly impaired.  Id.

7       Plaintiff argues that because she has not actually been on
8  consistent medication treatment for PTSD, Dr. Clayton's testimony
9  establishes  that  plaintiff  is  in  fact  disabled.  Because  her
10 impairments satisfy the "A" criteria of multiple mental health
11 impairment  listings,  and  Dr. Clayton's  testimony  shows  she  is
12 markedly impaired in two of the "B" criteria, plaintiff argues that
13 she meets all criteria for a listed impairment.

14      Dr. Clayton's  testimony  is  problematic.  At  first,  she
15 concludes that plaintiff has mild mental retardation.  Tr. 939.
16 Then, as recited above, she discussed Dr. Tinker's WAIS-III results
17 and  Dr. Bryan's  WAIS-III  results,  and  the  validity  of  those
18 results.  Tr. 939-42.  Then, she opined that without drug and
19 alcohol use, plaintiff would be markedly impaired in concentration,
20 persistence, and pace.  Tr. 943.  She also concluded that with
21 access to PTSD medications, plaintiff would be moderately impaired
22 in social functioning and mildly impaired in activities of daily
23 living.  Id.

24      Dr. Clayton's testimony is reviewed above.  Her testimony is
25 vague  as  to  whether  she  considered  plaintiff's  concentration,
26 persistence, and pace to be moderately impaired absent borderline
27 intellectual  functioning  or  with  borderline  intellectual
28 functioning.

48 - FINDINGS & RECOMMENDATION

1    But, most importantly, her testimony was unequivocal that with

2  an impairment of  mild mental retardation, plaintiff had marked

3  impairment in concentration, persistence, and pace. Tr. 943. The

4  ALJ found that plaintiff suffers from mild mental retardation.  Tr.

5  116.  Given the ALJ's own assessment of plaintiff's cognitive

6  functioning, it was error for the ALJ to reject Dr. Clayton's

7  opinion that in the presence of such a cognitive impairment,

8  plaintiff had marked impairment in her abilities of concentration,

9  persistence, and pace.

10    Additionally, Dr. Clayton found that without access to her

11  medication for PTSD, plaintiff's social functioning would be

12  markedly impaired. Tr. 943.  As discussed above, given the ALJ's

13  erroneous finding regarding plaintiff's access to medications, it

14  was error for the ALJ to disregard Dr. Clayton's assessment of

15  plaintiff's functioning absent access to medications.

16  III.  Rejection of Plaintiff's Testimony

17    Plaintiff contends that the ALJ erroneously rejected her

18  testimony about hearing voices and an inability to get along with

19  others.  Tr. 115.  The ALJ explained that

20          claimant has successfully spent periods of time
            incarcerated, emerging without injuries or records of
21          inability to get along with other prisoners.  She
            reportedly is homeless and spends a great deal of time on
22          the streets.  She has told some doctors that she has been
            attacked and victimized while on the street, but there
23          are no police reports or claims filed by her.  She has,
            quite the opposite, been able to procure crack cocaine
24          and alcohol, despite living on the street. In short, she
            appears to have incredible socialization skills to exist
25          in varied and unsecure [sic] environments.

26  Tr. 118.

27    This reasoning by the ALJ is baseless.  First, the ALJ

28  speculates as to the quality of the time plaintiff spent in jail

49 - FINDINGS & RECOMMENDATION

and her ability to function there.  Jailers do not routinely keep records of inmate sociological and psychological functioning on a day-to-day, or any other, basis.  There is simply no evidence in the record, one way or the other, regarding her behavior or discipline while incarcerated.  The ALJ's conclusion that plaintiff must be lying about being attacked or victimized while living on the streets because no police reports substantiate those incidents, is also based on speculation.  There is a plethora of reasons as to why a police report may not be filed and to assume that plaintiff is fabricating her testimony in this regard is not supported in the record.  The record is silent regarding the issue of how frequently, or infrequently, homeless crime victims file police reports.

Second, the ALJ's conclusion that a homeless person with mild mental retardation and PTSD, impairments the ALJ himself assessed, has "incredible socialization skills" because that person managed to obtain crack and alcohol while living on the street, is ludicrous.  It is also completely unsupported by any factual evidence or expert opinion in the record.

Third, the ALJ's other comments regarding plaintiff's lack of credibility, such as her physical pain complaints being unsupported by the medical evidence, and Dr. Bryan's comments regarding her exaggeration on psychological testing, do not afford the ALJ a basis upon which to reject her testimony regarding her ability to get along with others.  Unless there is affirmative evidence of malingering, the ALJ's reasons for rejecting plaintiff's testimony must be "clear and convincing."  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  The ALJ must identify what testimony is not

50 - FINDINGS & RECOMMENDATION

1   credible and what evidence undermines the plaintiff's complaints.

2   Id.   The evidence upon which the ALJ relies must be substantial.

3   Id.

4        Here, Dr. Bryan stated that no clear diagnostic conclusions

5   could be drawn due to her invalid engagement in testing.   Id.

6   Importantly, as noted above, the incomplete page with his

7   assessment suggests the possible provisional diagnosis of

8   malingering, but also makes references to a somatoform disorder and

9   other significant functional impairments notwithstanding that

10  provisional diagnosis.   Tr. 693.

11       Presently, there is no "affirmative evidence" conclusive of

12  malingering.   Therefore, the ALJ was required to articulate clear

13  and convincing reasons for his rejection of plaintiff's testimony

14  regarding her inability to get along with others.   As noted above,

15  the ALJ failed to support this rejection with substantial evidence.

16  IV.   Remand for Benefits

17       The court has discretion to reverse the Commissioner's final

18  decision with or without a remand for further administrative

19  proceedings.   Harman v. Apfel, 211 F.3d 1172, 1177 (9th Cir. 2000).

20  When an ALJ improperly rejects evidence, the court should credit

21  such evidence and remand for an award of benefits when:  "'(1) the

22  ALJ failed to provide legally sufficient reasons for rejecting such

23  evidence, (2) there are no outstanding issues that must be resolved

24  before a determination of disability can be made, and (3) it is

25  clear from the record that the ALJ would be required to find the

26  claimant disabled were such evidence credited.'"   Moore v.

27  Commissioner, 278 F.3d 920, 926 (9th Cir. 2002) (quoting Smolen, 80

28  F.3d at 1292).

51 - FINDINGS & RECOMMENDATION

1    Here, the ALJ first failed to provide legally sufficient

2  reasons for determining that plaintiff's intermittent access to

3  medications was due willful non-compliance and for determining that

4  she would not meet the twelve-month duration requirement because

5  she could rely on obtaining sample medications from community

6  resources.  The ALJ affirmatively stated that without access to

7  medications, plaintiff was disabled.  Thus, remand for additional

8  proceedings would be futile.

9    The ALJ next failed to provide legally sufficient reasons for

10  rejecting Dr. Tinker's, Dr. Colistro's, and Dr. Clayton's

11  testimony.  When that testimony is credited, it establishes that

12  plaintiff is disabled.

13    Finally, the ALJ failed to provide legally sufficient reasons

14  for rejecting plaintiff's testimony that she could not maintain

15  employment based in part on her inability to get along with people.

16  While that testimony, when credited, may not alone establish

17  disability, it is supportive of findings made by the examining

18  psychologists.

19                           CONCLUSION

20    The Commissioner's decision should be reversed and remanded

21  for a determination of benefits.

22                        SCHEDULING ORDER

23    The above Findings and Recommendation will be referred to a

24  United States District Judge for review.  Objections, if any, are

25  due July 10, 2008.  If no objections are filed, review of the

26  Findings and Recommendation will go under advisement on that date.

27  / / /

28  / / /

52 - FINDINGS & RECOMMENDATION

1        If objections are filed, a response to the objections is due

2   July 24, 2008, and the review of the Findings and Recommendation

3   will go under advisement on that date.

4        IT IS SO ORDERED.

5

6                    DATED this  25th    day of  June          , 2008.

7

8

9                                   /s/ Dennis James Hubel
                                    Dennis James Hubel
10  _____  United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

53 - FINDINGS & RECOMMENDATION